UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

B & P BAIRD HOLDINGS, INC.,

           Debtor.

_____/

KELLY M. HAGAN, chapter 7 trustee,

           Plaintiff,

v.

PAMELA BAIRD,

           Defendant.

_____/

Case No. DT 10-10941
Hon. Scott W. Dales
Chapter 7

Adversary Pro. No. 11-80397

MEMORANDUM OF DECISION AND ORDER

PRESENT:   HONORABLE SCOTT W. DALES
                Chief United States Bankruptcy Judge

I. INTRODUCTION

As counsel agreed during oral argument on the pending cross motions for summary judgment, this case has a voluminous history—numerous pleadings, amendments, settlements, motions, and appeals. In some ways this complicates the court's task, but in others, it simplifies it.

As a result of the prior decisions of the court and the parties, only two counts against a single defendant remain. The court must decide whether to permit chapter 7 trustee Kelly M. Hagan (the "Plaintiff" or the "Trustee") to bring the remaining conversion-based

claims against Pamela Baird ("Pam" or the "Defendant") to trial, or whether the court can resolve them summarily pursuant to Rule 56[1] as requested by the Defendant.

For the following reasons, the court will grant Pam's Motion, and deny the Trustee's Motion.[2]

## II. JURISDICTION AND RELATED MATTERS

The court has jurisdiction over the main bankruptcy case of B&P Baird Holdings, Inc. (the "Debtor") under 28 U.S.C. § 1334(a).  That case and this adversary proceeding have been referred to the court under 28 U.S.C. § 157(a) and W.D. Mich. LCivR 83.2(a). Although the remaining conversion claims are clearly "non-core" related claims with respect to which the court's authority to enter final judgment depends upon the consent of the parties, the parties have consented to entry of final judgment in accordance with the court's First Post-Remand Pretrial Order dated February 19, 2015 (DN 354).  *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015).  The court, therefore, finds that it has statutory and constitutional authority to resolve the parties' dispute.

## III. ANALYSIS

Most of the Trustee's claims against Pam, and all of her claims against William J. Baird ("Bill") and King Par, LLC, have been resolved by motion and settlement.  Pursuant to the settlements, following the decision of the Hon. Jeffrey R. Hughes avoiding the

---

[1] In this opinion, the court will refer to any of the Federal Rules of Civil Procedure as "Rule __," and to any of the Federal Rules of Bankruptcy Procedure as "Bankruptcy Rule __."

[2] The Trustee and Pam have each filed timely motions for summary judgment under Rule 56, made applicable in this case by Bankruptcy Rule 7056.  *See* Plaintiff Trustee Kelly M. Hagan's Motion for Partial Summary Judgment ("Trustee's Motion," DN 376); Defendant Pamela Baird's Motion for Summary Judgment (DN 377 and with supporting brief and exhibits, DN 378, referred to collectively as "Pam's Motion").

payments at issue here as constructively fraudulent transfers, Pam and Bill paid $3.775 million to the Trustee for distribution to creditors.

Now, only one count for conversion of money under Michigan's common law and another for statutory conversion under M.C.L. § 600.2919a remain against Pam.

### 1. Summary Judgment Standard

A court may grant a motion for summary judgment only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011); *see also Liggett v. Schwartz (In re Schwartz)*, Slip Op. No. 14–1433, 2015 WL 4478033 (6th Cir. July 21, 2015) ("Summary judgment is appropriate if the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.").[3]  "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A party's failure to establish an essential element of her case, on which she will bear the burden of proof, renders all factual issues immaterial, making summary judgment appropriate as a matter of law.  Here, the Trustee must bear the burden of establishing each element of her case for common law conversion, upon which both counts depend.  Pam's Motion puts the Trustee to her proofs.

---

[3] Hereinafter "*Schwartz.*"

2. <u>The History</u>

The following historical facts, either undisputed or based upon Judge Hughes's August 8, 2012 bench ruling on the Trustee's earlier summary judgment motion, explain the source of four payments which the court will refer to as the "Sale Proceeds."[4] At Bill's direction, the Debtor entered into an Asset Purchase Agreement and Land Contract by and among King Par Corporation and Baird Family, L.L.C., William Baird and KP Acquisition Company, LLC and Long Drive Holdings, LLC dated June 4, 2009 (the "APA," DN 376-14), to sell its operating assets to KP Acquisition Company, LLC for $3.4 million.[5]

The Trustee describes the transaction, without material controversy, in the Trustee's Amended Complaint for Conversion Against Pamela Baird – POST REMAND (DN 355, the "Post-Remand Complaint"):

> 14. In general terms, under the provisions of the APA, NKP acquired the operating assets of OKP, real estate owned by BFLLC, and services of Bill as a consultant to NKP.
>
> 15. The APA provided for NKP to acquire substantially all of the operating assets of OKP existing as of April 1, 2009.
>
> 16. Under the APA, NKP acquired all assets falling within the definition of "Included Assets" and assumed all liabilities falling within the definition of "Included Liabilities."
>
> 17. The APA left to OKP all assets falling within the definition of "Excluded Assets" and all liabilities falling within the definition of "Excluded Liabilities."
>
> 18. The APA contemplated that NKP would collect OKP outstanding receivables as of March 31, 2009, which receivables would remain the property of OKP. In return for its collection efforts, NKP was entitled to a percentage fee. From the receivables it collected on behalf of OKP after

---

[4] The Sale Proceeds include funds the buyer paid initially, as well as funds collected (and remitted) later on the accounts receivable the Debtor retained under the sale documents.

[5] The buyer later changed its name to King Par, LLC.  The court will refer to the buyer as "New King Par" or "NKP" to distinguish it from the Debtor, which the parties have occasionally referred to as "Old King Par" or "OKP."

closing, NKP would make payment of OKP payables outstanding as of March 31, 2009 or otherwise address them. The APA thus (a) left OKP with receivables and payables existing as of March 31, 2009, (b) tasked NKP with collecting such receivables and using the proceeds of such receivables to pay the payables, and (c) called for NKP to remit to OKP any funds remaining after such reconciliation.

19. To a significant practical extent, the APA provided that OKP would receive at closing a substantial payment for cash on hand plus operating assets acquired by NKP that day, plus proceeds from OKP owned receivables as of March 31, 2009 less OKP owed payables as of March 31, 2009 and thereafter receive additional proceeds from OKP owned receivables as of March 31, 2009 less OKP owed payables as of March 31, 2009.

20. Bill, on behalf of OKP, asked that the APA provide that NKP wire transfer all funds belonging to OKP to a specified account at Arvest Bank in Tulsa, Oklahoma.

21. Pursuant to the terms of the APA, and in connection with closing, NKP wired $4,010,242 on June 5, 2009 to the specified account at Arvest Bank in Tulsa, Oklahoma . . . .

22. In the months that followed the June 5, 2009 closing, NKP made three additional payments by wire transfer to the specified account at Arvest Bank in the following amounts on the following dates:

> October 14, 2009 $102,095
>
> November 18, 2009 $49,025
>
> December 15, 2009 $65,504

*See* Post-Remand Complaint at ¶¶ 14-22; Defendant's Response to Trustee's Amended Complaint for Conversion Against Pamela Baird – Post Remand (DN 357, "Post-Remand Answer") at ¶¶ 14-22.

There is no dispute, therefore, that, at the Debtor's direction, New King Par deposited $4,226,866 pursuant to the APA into an account at Arvest Bank in Tulsa, Oklahoma (the "Arvest Account").[6]

---

[6] Pam does not admit receipt of $4,010,242 in her Post-Remand Answer, but based on the bank statements submitted in connection with these motions, there is no serious dispute that New King Par wired the funds to

The payment terms, which Judge Hughes described in his August 8, 2012 bench opinion as "out of the ordinary,"[7] required that "whatever cash New King Par was going to pay to [the Debtor] either at close or thereafter, was instead to be paid to [Pam and Bill] *as theirs* through wire transfers to [their joint] account [at Arvest Bank in Tulsa, Oklahoma]." *See* MSJ Bench Op. at 16:11-14 (emphasis added).  He further described the arrangement as follows: "New King Par paid to the Bairds *as Old King Par's assignees* the $3.4 million less $440,000 in holdbacks . . . ."  *See id*. at 17:13-14 (emphasis added) and 20:16-18 (observing that the payments to Pam and Bill after June 9, 2009 "should be treated as part and parcel of the earlier assignment by Old King Par to the Bairds of the asset purchase price on June 9th, 2009").

After Judge Hughes rendered the aforementioned bench opinion, the parties entered into a settlement in which the Trustee reserved the right to assert the conversion claims against Pam.  It is these claims she is now pursuing.

### 3. Pam's Motion

In her motion, Pam contends that the Debtor's voluntary and unconditional transfer of the Sale Proceeds into the Arvest Account precludes relief on either of the conversion claims because the Trustee cannot establish any interference with the Debtor's property interest in the Sale Proceeds under the circumstances revealed in the record.  In other words, the Debtor's consent to the sale transaction and distribution of the Sale Proceeds dooms any claim sounding in conversion.

---

the Arvest Account as the Debtor directed pursuant to the APA. *See* Defendant Pamela Baird's Memorandum in Support of Motion for Summary Judgment, Exh. 6 (DN 378-7).

[7] *See* Transcript of Bench Opinion Re: Motion for Partial Summary Judgment Delivered on Aug. 8, 2012 (DN 226, hereinafter "MSJ Bench Op.") at 8:24.

Michigan's Supreme Court recently reiterated the elements of common law conversion, and the relationship of that tort to the statutory enhancements set forth in M.C.L. § 600.2919a, both of which the Trustee asserts against Pam.

According to the high court, "by the twentieth century common-law conversion more broadly encompassed any conduct inconsistent with the owner's property rights." *Aroma Wines & Equip., Inc. v. Columbian Distribution Servs., Inc.*, 497 Mich. 337, 346 (2015). The Trustee will prevail on her common law claim if she establishes "any distinct act of dominion wrongfully exerted over [the Debtor's] personal property in denial of or inconsistent with [its] rights therein." *Id.*, 497 Mich. at 353.

The statutory counterpart to common law conversion found in M.C.L. § 600.2919a is limited to "a subset of common-law conversions in which the common-law conversion was to the other person's own use." *Id.* (internal quotation marks omitted). The statute provides as follows:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
>> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>>
>> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.
>
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

M.C.L. § 600.2919a. To summarize, in order to prevail on either count against Pam, the Trustee must prove that either she, Bill, or both of them interfered with the Debtor's rights

in specific personal property.  To prevail on the statutory enhancement, she must also establish that Pam converted the Sale Proceeds to her "own use."

The Sixth Circuit, in a recent case involving conversion claims premised on Michigan law, similarly characterized conversion "as any distinct act of domain wrongfully exerted *over another's personal property* in denial of or inconsistent with the rights therein." *Schwartz, supra,* at *5 (*citing Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992)) (emphasis added).  In rejecting the conversion claim advanced in that case, the Sixth Circuit expressly "emphasize[d] the necessity of a property interest to distinguish it from a contractual obligation, which will not support a conversion claim by itself." *Id.*  The emphasis on a property interest as a prerequisite to relief on a conversion theory distinguishes conversion claims not just from breach of contract claims, but also from other tort claims not involving property interests, such as the Trustee initially asserted against Pam and Bill, but later resolved in the settlements for $3.775 million.  The Trustee has identified the property interest at the heart of her conversion claims as the Debtor's supposed property interest in the Sale Proceeds.

During oral argument, however, the Trustee made two significant concessions.  She conceded that even after the close of discovery, she has uncovered no evidence that Pam was involved in structuring or effecting the sale of the Debtor's assets, or the decision to transfer the Sale Proceeds into the Arvest Account.  Rather, as she alleged in the Post-Remand Complaint, "Bill, on behalf of OKP, asked that the APA provide that NKP wire transfer all funds belonging to OKP to a specified account at Arvest Bank in Tulsa, Oklahoma." Post-Remand Complaint (DN 355) at ¶ 20.

The Trustee also conceded that there is no evidence that either Pam or Bill embezzled the Sale Proceeds. Indeed, during oral argument the Trustee expressly abandoned that aspect of her conversion claim, and agreed that the transfers by the Debtor to Pam and Bill were not illegal. From these concessions, the court reaches the following initial conclusions.

First, if the several wire transfers (representing the Sale Proceeds) from New King Par into the Arvest Account amounted to a conversion of the Debtor's personal property, then Bill, rather than Pam, would be the culpable party on account of the original wire transfers. This follows from the Trustee's concession at oral argument that Pam was not involved in the sale transaction. In this scenario, only Bill is alleged to have converted the funds and the Trustee's cause of action would fail against Pam (to the extent premised on the initial transfers into the Arvest Account).

Second, if Bill converted the funds by arranging for their transfer into the Arvest Account in a manner inconsistent with the Debtor's property interest in the funds, Pam's use of the funds, whether innocent or malicious, also amounted to a conversion of the Debtor's funds.[8] There is no genuine issue as to Pam's use of the funds originally deposited into the Arvest Account, even if (as she claims) someone forged her signature on the signature card. The money from that account funded numerous payments on Pam's behalf, including the purchase of a condominium in Hawaii. *See* Trustee's Brief to Motion for Summary Judgment, Exh. K, Deposition of Pamela Baird, (DN 376-12) at p.113:5-9

---

[8] Although the Trustee has settled her claims against Bill, the court does not read the settlement agreement as precluding her from proving that Bill converted the funds in the first instance, but only from recovering the funds from Bill.

(transfer to CD); p.125:6-17 (transfer to three CD's); p.128:8-130:2 (transfer to bank accounts); p.134:16-21 (transfer to bank account); p.137:14-139:3 (transfer to bank account); p.142:7-14 (purchase of Hawaiian condominium). In this scenario, both Bill and Pam are alleged to have converted the funds, and the Trustee's cause of action against Pam, which survived the earlier settlement, might warrant a trial on the merits.

Third, even if Bill did not convert the funds by arranging for their transfer into the Arvest Account, Pam may nevertheless have converted the funds if the Debtor retained a property interest in the funds in that account, for example by entrusting the funds or otherwise attaching conditions to the use of the money. In this scenario, only Pam would have allegedly converted the funds, and again the Trustee's cause of action might survive summary judgment.

The Trustee has the burden at trial of proving that Pam's use of the Sale Proceeds was an act of dominion "wrongfully exerted" over the Debtor's personal property in denial of or inconsistent with its rights. This trial burden affects the summary judgment analysis. Keeping the Trustee's burden of proof in mind, the court turns first to the question of whether Bill converted the funds by transferring them into the Arvest Account and then whether Pam, in turn, converted the funds when she used them.

Pam argues that the Debtor voluntarily transferred the funds into the Arvest Account at Bill's direction and that after each transfer, the Debtor retained no property interest in the funds. Citing her ex-husband's recent declaration under 28 U.S.C. § 1746,[9] she argues that the Debtor intended to distribute the funds to Bill as shareholder while

---

[9] Defendant's Brief in Support of Motion for Summary Judgment, Exh. 3 (DN 378-4).

informally winding-up the Debtor's operations, and did so without imposing any restrictions. Therefore, she contends, because it is impossible to convert property that the alleged victim intended to convey, neither she nor Bill converted any of the Debtor's property. *See Lawsuit Financial, L.L.C. v. Curry*, 683 N.W.2d 233 (Mich. App. 2004) (To support an action for conversion, property must have been obtained without owner's consent). As documentary evidence, Pam refers the court to the Officers Certificate Provided by King Par Corporation (with attached corporate resolution) authorizing the transaction, and the fact that the wire transfer instructions directing payment into the Arvest Account are Exhibit B to the APA. *See* Pam's Motion at Exh. 8; APA at Exh. B (attached to Trustee's Motion as Exh. 1 (DN 378-2)).

Pam also cites the finding Judge Hughes made while granting the Trustee's prior summary judgment motion—a conclusion that the Sixth Circuit did not disturb on appeal—to the effect that "whatever cash New King Par was going to pay to Old King Par, either at close or thereafter, was instead to be paid to [Bill's] wife and him as theirs through wire transfers . . . ." *See* MSJ Bench Op. at 16:12-14. Indeed, Judge Hughes twice characterized the arrangement as an assignment from the Debtor to Bill and Pam. Accordingly, she contends, her use of the funds, even if established, was not inconsistent with the Debtor's rights, because the evidence in the record shows that the Debtor intended to voluntarily transfer the Sale Proceeds to Bill and Pam without retaining any interest. Her contention finds support in Judge Hughes's decision to avoid the transfers under § 548, and the underlying conclusion that the Debtor transferred the funds to Pam and Bill outright, effectively divesting the Debtor of any interest in the funds.

Significantly the Trustee has not suggested that the Debtor lacked authority to enter into the APA itself, or that the agreement was void.  In fact, the Trustee's current pleading recites that ". . . under the provisions of the APA, NKP acquired the operating assets of OKP . . . ."  Post-Remand Complaint at ¶ 14.  This statement would be false if the Debtor had not consented to the sale transaction, and divested itself of its interest in the assets, even if its consent depended upon Bill as the principal (if not sole) shareholder, officer, and director.  In addition, the record is clear that the wire transfer instructions (directing payment of all proceeds to Pam and Bill's account at Arvest Bank) are part of that same agreement.  The APA, therefore, shows that the Debtor not only authorized the sale, but specifically directed the transfers to Bill and Pam.

Based on the foregoing citations to the record, Pam argues that the Debtor's consent to the transfers dooms the conversion counts, both of which are premised on a showing that Pam interfered with the Debtor's property by using the funds in the Arvest Account.

After carefully reviewing Pam's Motion, the court concludes that she has met her summary judgment burden, making it incumbent upon the Trustee to establish that the transfer of the Sale Proceeds into the Arvest Account was, to paraphrase the Michigan Supreme Court, in denial of or inconsistent with the Debtor's rights in the property. In the face of Pam's evidence, the Trustee, as the party with the burden of showing that the transfer was not authorized, had to come forward with evidence that the Debtor did not authorize the transfers.

Rather than offer evidence contradicting this showing, the Trustee instead argues, in essence, that the Debtor should not have transferred the funds because of the effect the

transfers had on the Debtor's creditors.  In addition, she argues that by causing the Debtor to assign the payments to Bill and Pam, Bill breached his fiduciary duties to the Debtor under corporate law.  In short, the Trustee asserts that the Debtor *should not* have transferred the funds, not that the Debtor *did not* transfer them.  Accordingly, the Trustee offered no evidence contradicting Pam's submissions tending to show that the Debtor authorized the transfers into the Arvest Account.

To be sure, as the Trustee persistently argues, Judge Hughes's bench ruling granting the Trustee's earlier summary judgment motion found that the transfer *harmed the Debtor's creditors* by leaving the Debtor with no assets with which to pay their claims.  This was the reason the court granted the Trustee's earlier summary judgment motion and avoided the transfers under § 548(a)(1)(B)—to make the creditors whole.  But the Trustee's right to assert the conversion claims depends upon her showing that the transfers harmed the *Debtor*; it is no longer relevant that they harmed the creditors.  This follows from the fact that, with respect to the remaining causes of action, the Trustee is asserting the *Debtor's* state law rights against Pam under § 541, not the Trustee's strong arm powers.  Stated differently, the Trustee may no longer assert the *creditors'* right to recover for their collective injury because she has already redressed this through the fraudulent transfer avoidance and the resulting settlement.  The conversion counts, on the other hand, require proof that the transfers in and out of the Arvest Account *injured the Debtor*.[10]

---

[10] Trustee's citation within her current pleading to § 544 and *Moore v. Bay*, 284 U.S. 4 (1931), evidences the confusion.  *See* Post-Remand Complaint at ¶ 92.  The Supreme Court's decision in *Moore* is a fraudulent transfer decision based on California law, and § 544 is federal law that gives bankruptcy trustees the "strong arm" powers incorporating state law creditor remedies.  The fact that any recovery will be shared *pro rata* with creditors under § 726 does not excuse the Trustee from proving injury to the Debtor directly, rather than to the creditors derivatively.

Accordingly, the court finds that Bill did not convert the funds because the Debtor authorized and directed the transfers to him and Pam, as Judge Hughes previously found. Therefore, the Trustee cannot recover from Pam under any theory that requires a finding that Bill converted the property as part of the initial transfer.

Next, even if Bill did not convert the funds, it is still conceivable that Pam converted them (for example by purchasing the condominium in Hawaii) if the Debtor retained a property interest despite transferring them into the Arvest Account. To address this possibility, Pam again relies on Judge Hughes's August 8, 2012 bench ruling, arguing that the court is precluded from finding that the Debtor retained any interest in the funds either under the doctrines of judicial estoppel, law of the case, election of remedies or some other theory.

Having carefully considered the August 8, 2012 ruling, the court shares Pam's view that the Debtor retained no property interest in the funds after New King Par transferred them to the Arvest Account per the Debtor's wire transfer instructions. *See, e.g.,* MSJ Bench Op. at 16:12-14 ("whatever cash New King Par was going to pay to Old King Par, either at close or thereafter, was instead to be paid to [Bill's] wife and him as theirs through wire transfers . . ."); 37:5-9 (expressing "difficulty understanding the reasonableness of his decision not to leave with Old King Par at least some portion of the $4 million in cash New King Par paid at close instead of having all of it paid into the Arvest Bank account to his and his wife's benefit . . ."). Indeed, the reason the law condemns fraudulent transfers is precisely because they remove from debtors the property that they should be using to pay creditor claims. *Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528 (6th Cir. 2003) (the very purpose of fraudulent transfers from the debtor's point of view is to put property beyond

the reach of creditors).  Judge Hughes found that the transfers rendered the Debtor insolvent, with nothing left to pay claims.  This is precisely why the court treated the transfer of the Sale Proceeds to Bill and Pam as constructively fraudulent and why the Trustee succeeded in that part of this lawsuit.

The Trustee sees things differently.  She argues that Pam and Bill received the funds as the Debtor's agents, or subject to their fiduciary duties to the Debtor as officers, directors, or controlling shareholders, and were not free to use the funds as they wished. In support, she relies primarily on Judge Hughes's decision early in the case denying a Rule 12(b)(6) motion addressed to the conversion issue.

More specifically, in her brief in opposition to Pam's Motion, the Trustee suggests that in a bench opinion on March 13, 2012, Judge Hughes ruled that the funds in the Arvest Account were held by Pam and Bill as the Debtor's agents or subject to something more than a contractual duty to the Debtor, *i.e.*, some interest that could support a claim for conversion.  That ruling, however, predated the court's ruling on the Trustee's later motion for partial summary judgment, which clearly held that the Debtor parted with all property as a result of the APA and the transfers into the Arvest Account.

Moreover, the difference between the standards governing dismissal motions under Rule 12(b)(6) (such as the motion that Judge Hughes resolved in his March 13, 2012 ruling) and summary judgment motions under Rule 56 (memorialized in the August 8, 2012 ruling) is significant.  The former accepts the allegations in the complaint as true, and reads the document liberally in plaintiff's favor for purposes of the motion.  The decision on a Rule 12(b)(6) motion does not establish facts, but considers only whether the plaintiff has stated

a claim, not whether she has established one. *See* Fed. R. Civ. P. 12(b)(6); *see also* Charles Alan Wright *et al.*, 5B Fed. Prac. & Proc. Civ. § 1356 (3d ed. 2015) ("the purpose of a motion under Federal Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; the motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case"). In contrast, when a court considers a motion for summary judgment, Rule 56 expressly authorizes the judge to treat any material fact that is not genuinely disputed as established in the case. *See* Fed. R. Civ. P. 56(g). Therefore, the inferences that Judge Hughes drew in considering whether the Trustee stated a claim for conversion, including those about the plausible nature of Pam's and Bill's relationship to the funds in the Arvest Account, are not established for purposes of today's summary judgment motions, and are not the law of the case. At most, the opinion expressed the plausible *possibilities* that the court was required to accept, at the pleading stage, while resolving a motion under Rule 12(b)(6).

It bears repeating that the Sixth Circuit in *Schwartz* expressly emphasized the "necessity of a property interest to distinguish [conversion] from a contractual obligation, which will not support a conversion claim by itself." *Schwartz, supra,* at *5. Michigan's courts have similarly hesitated to transform a breach of a contractual duty to pay money into a conversion account, recognizing that conversion of money, generally regarded as an intangible, requires special considerations. *Vodopyanov v. Keller Williams Realty*, Slip Op. Doc. No. 296939, 2011 WL 3760894, *9 (Mich. App. Aug. 25, 2011) ("Generally, money is considered intangible and not subject to a claim for conversion unless the claim involves an obligation to return to the plaintiff precise and specific money."). In Michigan, money may be the subject of a conversion action provided that "there is an obligation to

keep intact or deliver the specific money in question, and where such money can be identified." *Dunn v. Bennett*, 846 N.W.2d 75, 81 (Mich. App. 2013) (*citing Garras v. Bekiares*, 23 N.W.2d 239 (Mich. 1946)) (citation and quotation marks omitted); *see also Citizens Ins. Co. of America v. Delcamp Truck Ctr., Inc.*, 444 N.W.2d 210 (Mich. App. 1989). With this "specific money" requirement, it would seem that conversion claims involving "money" would apply more comfortably to coin collections than wire transfers.[11]

The Trustee has offered no evidence that the Debtor retained a property interest in the funds, after the transfer, or that either Pam or Bill had the obligation to return the specific monies transferred to them following the execution of the APA. Certainly, the Trustee has done a good job at identifying the monies, but success on a conversion count involving money is not assured simply by tracing funds. The plaintiff must establish "an obligation to keep intact or deliver the specific money in question." *Garras*, 23 N.W.2d at 242 (*citing Globe & Rutgers Fire Ins. Co. v. Fisher*, 207 N.W. 884 (Mich. 1926)). Given the intangible nature of money, the Trustee's case against Pam depends upon a showing that either Pam or Bill had an obligation to return the specific funds transferred into the Arvest Account. In his declaration, Bill states that the transfers to him and Pam were "free from any restrictions or obligation owed" to the Debtor. *See* Declaration of William J. Baird dated July 23, 2015 (DN 378-5) at ¶¶ 4-5. At most, the Trustee *argued* that Pam or Bill may have had contractual duties (as the Debtor's agents) or corporate duties (as officers, directors, or shareholders) to use the funds to pay claims identified in the APA as

---

[11] Ordinarily, the deposit of funds with a bank creates a debtor-creditor relationship, where the depository is the debtor and the depositor is the creditor, with the former having a duty to account to the latter for the value of the deposit, not the specific funds. *Allied Fidelity Ins. Co. v. Bank of Oklahoma*, 894 P.2d 1101, 1103-04 (Okla.1995).

"Excluded Liabilities," not to return the funds *in specie*, a requirement the Sixth Circuit emphasized in *Schwartz*, based on its reading of Michigan law.

Finally, the court has carefully considered the Sixth Circuit's opinion overruling Judge Hughes's order denying the Trustee's motion to amend her complaint, and does not regard the panel's decision as controlling the present decision because, as the Sixth Circuit observed, it was considering only whether, at the pleading stage, the *in pari delicto* defense rendered futile the Trustee's proposed amendment to her complaint. *See Hagan v. Baird (In re B&P Baird Holdings, Inc.)*, 591 Fed. Appx. 434, 435 (6th Cir. 2015) ("The question on appeal is whether the bankruptcy court properly concluded that the doctrine of *in pari delicto* bars the Trustee's claim of conversion against Pam, thus rendering Trustee's proposed amendment futile."). The Sixth Circuit made no decisions on the merits, including about whether the Debtor intended to transfer the funds to Bill and Pam, or whether the Debtor retained any interest in the funds in the Arvest Account.

Moreover, as the Trustee acknowledged in her moving papers, the Sixth Circuit's opinion did not disturb Judge Hughes's summary judgment bench ruling. Rather, the appeals court simply reviewed the Trustee's proposed pleading to determine whether the allegations were sufficient to state a claim; it did not adopt the allegations as fact, but only accepted them as true for purposes of reviewing the pleading under well-settled standards governing Rule 12 and Rule 15 motions. Again, different standards apply after the parties have developed the record through discovery and have asked the court to consider the record under Rule 56. When the Trustee abandoned her embezzlement theory, the question of any *in pari delicto* defense became irrelevant, according to her own argument.

Today's decision, in contrast, considers whether the Trustee can establish a *prima facie* case, based on the current and more developed record. In response to Pam's Motion, the Trustee had the burden of setting forth specific facts showing a genuine dispute on the question of the Debtor's property interest in the funds, and whether either Pam or Bill had an obligation to return them. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Her failure to meet this burden is dispositive. Because she cannot establish a *prima facie* case for conversion, the court need not consider the *in pari delicto* defense discussed in the Sixth Circuit's opinion.

The court has considered the Trustee's other arguments against Pam's Motion and finds them without merit. Because the Trustee cannot establish a crucial element of her conversion case against Pam—that Pam's use of the funds violated the Debtor's property interests—the court will grant Pam's Motion.

4. The Trustee's Motion

The court's decision on Pam's Motion makes it unnecessary to discuss separately all the Trustee's arguments in support of her own motion, most of which the court has specifically rejected in the preceding discussion. The court has considered the Trustee's other arguments in support of her motion and is similarly unpersuaded.

IV. CONCLUSION

The court does not condone the method of winding-up the Debtor's affairs that Bill pursued starting in the spring of 2009. The process was tainted with numerous badges of fraud, and although the court need not determine whether Bill (and the Debtor) actually

intended to hinder, delay, or defraud creditors, the effect of Bill's sub-par corporate dissolution plan had that precise effect, as Judge Hughes determined in avoiding the transfers from the Debtor to Bill and Pam. Nevertheless, the Trustee has recovered $3.775 million on account of that injury, admittedly by accepting discounted payments in order to effect a settlement. Although this settlement may not have made the creditors entirely whole for the injury they suffered, that is no reason to confuse remedies available for injuries to creditors with remedies available for injuries to the Debtor. Conversion falls in the latter category, and thus requires proof that Pam interfered with the Debtor's interest in property, or at least that she should be held accountable as complicit with Bill, whether maliciously or innocently, in his supposed interference with such interests. The Trustee's case failed on the proofs. That this failure will diminish the ultimate distribution to creditors, does not change the court's conclusion.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. Pam's Motion (DN 377) is GRANTED;

2. The Trustee's Motion (DN 376) is DENIED; and

3. The Clerk shall enter judgment in Pam's favor, consistent with this Memorandum of Decision and Order.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum of Decision and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Jonathan R. Moothart, Esq., and Michael D. Almassian, Esq.

**IT IS SO ORDERED.**

**Dated October 15, 2015**



Scott W. Dales
United States Bankruptcy Judge